seated please. We welcome you here today during Jazz Fest week. I hope you were able to pay a reasonable price at the hotels. We, I know, no point in talking about our rules because you're intimately familiar with them. So I will simply call the first case in the morning number 25-20204, Sullivan v. Feldman, and we'll hear from Mr. Malkonian. Thank you, Your Honors, and may it please the Court. My name is Raffi Malkonian. I represent the appellants in this matter. In our view, this is a relatively straightforward case about a motion to compel arbitration and the interpretation of the same arbitration clause and delegation clause that this Court recently interpreted in Sullivan v. Feldman, which we call in our briefing Sullivan 1. In that case, this Court held that the delegation clause that we're disputing today was extraordinarily broad. It was so broad that it allowed a delegation of class arbitrability over people who were, of course, not signatories to the arbitration agreement. And it was also so broad that it allowed the arbitrator to ignore the time limit set forth for an award in the arbitration agreement. We think the same should hold true here. Whether the plaintiff's claims are arbitrable is a question that was delegated to the arbitrator by the arbitration agreement. The district court erred by not giving effect to the delegation clause and, indeed, by not interpreting the delegation clause. Well, let me ask you a preliminary question. What is the status of the arbitration that was supposed to settle the quadruple arbitral awards? Yes, Your Honor. As you explained in Sullivan 1, the parties were free to go arbitrate further the dispute between the four contradictory awards. We have done that. The case is pending before Judge William Boyce, the former judge on the Texas Court of Appeals. And we are awaiting his decision on that question. When did you present it? Your Honor, I believe we argued it a couple months ago. I'm forgetting the date just now. Oh, okay. But we argued in front of Justice Boyce for a full day. He is writing an opinion as we speak. If he were to issue an opinion, would that have an impact on this potential arbitration? Yes, it could, Your Honor, because as Your Honor remembers, there were four contradictory  Boy, do I remember. Yes. I hesitate to repeat the facts of that case. But as Your Honor remembers, there are four disputed arbitrations. One was $1.5 million. That was the low end, the Glasser Award. One was this, in our view, excessive $100 million award against Mr. Feldman by Mr. Jones. So we have paid the $1.5 million judgment, the Glasser Judgment. To whom? To our opponents. Okay. And we have received a release of that judgment. So if Justice Boyce rules, as we have urged, that the Glasser Award is the controlling award over the other three awards, then this case vanishes because we would have satisfied the judgment and there wouldn't be a problem. I will say our opponents, and they may tell you this, have taken the position that even if Justice Boyce rules that the $1.5 million governs, they would take the position that what Your Honor called the internally inconsistent final judgment would control over that. I assume we're going to have to have a fight about that at some point. But right now, our view is if Justice Boyce rules in our favor, that would vitiate this case. And if it came to that, if it came to a fight over the arbitral award, that would go back to Judge Rosenthal? I believe so, Your Honor. I mean, we haven't worked that through, because I'm hoping that doesn't happen. All right. Well, that's sort of what I suspected. All right. Well, explain, since there are many more defendants in the current case, how does your arbitration clause cover all of the affiliates? Yes, Your Honor. So we have a couple answers to that. One is that this is, our friends on the other side really want this to be a non-signatory case, like Newman v. Plains All-American or Jody James from the Texas Supreme Court. But it really isn't that kind of case. There are signatories to the arbitration agreement on both sides of the v. The plaintiffs are signatories to the arbitration agreement. Mr. Feldman and the Feldman law firm are signatories to the arbitration agreement. What Mr. Feldman is saying, or we are saying, is that he bargained for the right to arbitrate all disputes between himself and the doctors, including as to his affiliates, before arbitration. So it's not necessarily that the non-signatories are pressing arbitration, though they are as well. Mr. Feldman is pressing his own rights to arbitrate over an arbitration agreement that no one disputes exists. Everyone agrees there's a valid arbitration agreement. Well, no, what I'm saying is there are all these additional affiliates, these LLCs or whatever these other companies are, that are associated with Feldman and Mott. And then Feldman as trustee. And your argument, as I understand it, is they're affiliates. Yes, Your Honor. Explain a little more carefully, more distinctly, why are they affiliates that would be covered by the agreement? Oh, okay, Your Honor. I'm sorry. I misunderstood. So why they're affiliates is the definition of affiliate that I think no one really disputes is people that are in common control with one another. Now, our opponents are going to say that, are going to quibble with the definition of affiliates because there's a defined term in what's called the Capstone Services Agreement. And they say that somehow doesn't apply to the engagement letter. We don't really even need to get into that dispute. The term affiliates under its normal dictionary definition is, and this is in our reply brief, are people who are controlled by one another. And that's also the definition the Ninth Circuit used in the case that they rely on, the Ravage case. So I don't think there's actually a dispute about the definition of affiliates in this case. And then the question is, well, are these people affiliates? Now, my first point is that that is delegated to the arbitrator, as you've already heard. They can go argue that some group of them are not affiliates or some are affiliates or what have you, and the arbitrator can decide that. But the second point is, they have essentially admitted that every single one of the defendants is an affiliate. The whole premise of the Tufta case and the other claims that they've brought is that these are all affiliates. That's what their complaint says, again and again. And on top of that, there's a declaration by Mr. Feldman, which is, you know, in the record undisputed. This is at ROA 674, and then at ROA 678, he directly says, these are all affiliates of me. So there's not really any dispute between the parties that every single one of the 25 non-Mr. Feldman defendants in this litigation is an affiliate. So I, and, you know, looking at their brief carefully, I actually don't see them saying that they aren't affiliates. What they say is, well, it's kind of unfair if all these people that we didn't anticipate show up are affiliates and that would cause this kind of parade of horribles for us. But the answer I would have to that is that, first of all, they were very sophisticated parties. They had full counsel during all that. You know, they understood perfectly well that affiliates means affiliates. But on top of that, that is something they can take to the arbitrator doing Tufta. Well, suppose it was Feldman's kid. Would he be an affiliate? I don't know, Your Honor. I think so because, you know, the definition that I've been proffering is mostly about corporations, but I think children are generally affiliates. But I haven't looked into that, honestly. Well, what about Feldman as trustee for, you know, in law sometimes it's said that the trustee is, well, it is said that the trustee is distinct from the individual. I think that is what the law says, Your Honor. But I also think that in this context we have viewed them as affiliates. Mr. Feldman says the trust I believe is an affiliate. I'd have to double check that. But I guess more to the point, they have not disputed. They haven't gone into the 25 defendants and said this one's an affiliate, this one's not an affiliate. The position they've taken is that they're all not affiliates, even though I want to be clear, the district court did not make any findings about it. Well, I understand that. So we can move over to what the district court said, and she said this is a dispute over enforcement of a judgment. Yes, Your Honor. And so a couple of responses to that. So first of all, again, and I'm sorry to harp on this, we think that's a question of the delegation clause. And so the district court should not have interpreted the arbitration agreement. Well, that's, I mean, you don't have any case that says that, right? Whether this is merely enforcement of the judgment, it's a new lawsuit, right? I agree it's a new lawsuit. But I mean, I think all the cases like Kubala or Sullivan 1 that say all questions of arbitrability are delegated to the arbitrator, those are the same cases that say the question of whether this is an enforcement action should be dealt with. But you had to go to someone, plaintiffs had to go to Judge Rosenthal to confirm the awards. Yes, Your Honor. We think that that is probably the case. I'm not sure I understand whether, I mean, whether this litigation is an enforcement action or not. Yes, Your Honor. Our position is that that is a question of delegation. I think that's a stretch. Okay. Well, if it's a stretch, let me go to my second argument, which is that the grant of power of enforcement to the district court in the arbitration agreement is not exclusive. So I was looking at the case you took on Bonk last night, the Aramark case. And in that one, there was an exception from the arbitration clause for things that have to do with equitable relief, I think. And it said everything is arbitrated except for whatever this other category is. This arbitration agreement and this delegation clause is not like that. There is no exclusion from the broad power of arbitrability for enforcement. At best, it's dual jurisdiction. Well, suppose instead of their having filed another lawsuit, the question was post-judgment discovery or execution. Would you say that that is arbitrable also? So that is a much harder question, Your Honor. And in fact, there was post-judgment discovery in this case. We did not seek to compel arbitration over that. Our view at the time was that that was not even a dispute or controversy covered by the first clause of the arbitration agreement. And so we weren't going to press that. I think it would be very hard for me to stand up here and say that post-judgment discovery in the same action is necessarily an arbitrable decision. I think it would be very hard to do that. Yes. And that's why we didn't do that, Your Honor. But I will say that this one is a new case, new parties, new causes of action seeking a new judgment. And our friends on the other side are going to say, I think, that no, no, no, this is just an enforcement action in the first case. But look at the causes of action and look at the damages that they're seeking. You know, ROA-69, they were seeking damages for fraud, just normal common law fraud damages against the defendants. Those are not Tufts claims. Those are brand new causes of action. ROA-69, they're seeking punitive damages. They're seeking an award of damages against every single defendant, a constructive trust, alter ego, veil-piercing. None of those are necessarily Tufts remedies. In fact, they're not Tufts remedies. They're common law remedies. And they are consistent with their complaint that, yes, alleges Tufts causes of action, but also alleges all kinds of common law causes of action. Last, let me talk, my third point about enforcement. If you get down to the point of interpreting whether this is purely an enforcement action, we think the district court got that wrong as well, if she was empowered to look at it. The best analogy we've come up with for thinking about what enforcement means in this arbitration agreement is to analogize it to the ancillary enforcement power of the federal district courts. And I don't think that our opponents have really disputed that that is a reasonable frame to look at it. And so if you look at your cases, so the Berry case that says that if there is a new cause of action that is outside the ancillary enforcement power of the district court, that certainly would not qualify here. But also if you look at Peacock, which our opponents, that's the U.S. Supreme Court case, which our opponents say vitiates Berry and sort of enlarges the ancillary enforcement jurisdiction of Berry. What I would point out about Peacock is that in that case, the Supreme Court of the United States disapproved the application of ancillary enforcement authority over a fraudulent transfer and alter ego case. That's the holding of Peacock. And so if Peacock's the case that they're going to put all this weight on and the district court put weight on, I would say that that is very strong indication of term enforcement here did not mean to give jurisdiction over brand new cases and brand new causes of action. Well, I just have one other question. What are you going to do when you run out of arbitrators? Your Honor, so as I said at the beginning, we have been able to agree on Justice Boyce. The parties got together and we picked what we thought was an absolutely unimpeachable arbitrator that no one could say was unfair. We are hopeful that in this new arbitration, if it goes forward, that same will hold true. We are not trying to get an unfair advantage at this point because, as Your Honor knows, this has gotten completely out of hand over many years. So I think what we are at least trying to do is bring this shift into dock and end the litigation. All right. You have a chance for a bubble. Thank you, Your Honor. All right. Mr. Friedman. Thank you, Your Honors, and may it please the Court, David Friedman, on behalf of the appellees, the parties have already arbitrated. Four arbitrators issued final arbitration awards in the doctor's favor and against the felon endeavors. The district court confirmed those awards and converted it into an Article III judgment, prompting the felon endeavors to then systematically strip themselves of all assets for the purpose of rendering the court's judgment uncollectible. How do you know the timing of that? Your Honor, you can look in our 230 paragraphs of detailed allegations. Well, that's why I'm embarrassed to say I didn't read all 230 paragraphs. That's fine, but we have tracked the, this is the post-judgment discovery we got, I believe it was July of 2023. I have another preliminary question. Have any of the doctors ever been sanctioned or held to pay retroactive taxes by the IRS? I'm not aware of that having occurred. Have they been audited? They were audited, yes, Your Honor. I'm aware that was going on during Sullivan 1 based on the IRS letters were saying that it was based on their involvement. So the whole point of this case is that your clients were sold a bill of goods on a tax shelter arrangement, and that would normally mean that the IRS would come after your clients for various kinds of remedies, including back taxes. If that's never happened, how do you have all these damage claims? Your Honor, the original genesis of the original arbitration before Dorfman, not even the four arbitrators, was that dispute. When the IRS, when the tax court said that this thing was not- As to them, as to the insurance company. Which led to our company saying, please let us out of your program, to which they said, no, you can't until all the liabilities are gone. They wouldn't tell us what those liabilities were. It ended up being a lawyer who didn't disclose to his client that the client was insuring the lawyer's malpractice, even in suits against them, leading to theft of client funds in the amount of $3 million. That's the suit. That was why four arbitrators ruled in our favor and held the Feldman debtors liable for egregious breaches of fiduciary duties. Well, I understand that, but the range between one and a half and 100 million is a little bit. Anyway, I don't want to waste your time. And I appreciate that, Your Honor. We are arbitrating the inconsistencies. You're arbitrating until the cows come home, I understand. We're hoping that this ends- But you don't want to arbitrate this. Correct, Your Honor, because there's a lot at stake here. If Your Honors were to accept their argument and for the first time accept that post-judgment enforcement, including the paradigmatic examples held up by the Supreme Court as falling within post-judgment enforcement powers, an Article III court has to surrender that to an arbitrator. And this is the point I was making, that our fraudulent conveyance claims, we brought to the district court, the same court that issued the judgment. And that is squarely what post-judgment enforcement has always meant. It has a different cause number, doesn't it? Correct, and I'm happy to address that too, Your Honor. And it got to Judge Rosenthal because you probably said there was a related case, right? Correct, Your Honor. And the reason we filed it separately, and I don't think that's a dispositive issue, is because Sullivan 1 was on appellate review and the original matter was stayed. We were up against statute of limitations for $38 million of money that just left their accounts after these awards and judgments were coming out. So we had to file it, the first matter was stayed. But the district court's reasoning, and this is really what I want to talk about, is grounded in three separate foundations. Constitutionally under Peacock v. Thomas and its progeny, statutorily, the Federal Arbitration Act itself in section 13 mandates enforcement in a court. And contractually, record of 310, the party's arbitration agreement here, expressly preserves to the district court enforcement powers. It says after a confirmed arbitration award has come out, any person may apply to a U.S. district court for all purposes, including enforcement of the confirmed award. Constitutional, statutory, and contractual all support Judge Rosenthal's opinion here. Constitutionally, Peacock v. Thomas grounded ancillary jurisdiction in Article III of the Constitution. It stated, without ancillary jurisdiction, the judicial power would be incomplete and entirely inadequate for the purposes to which it was conferred by the Constitution. In Peacock v. Thomas, the Supreme Court approved a broad range of supplemental proceedings involving third parties and specifically held up the avoidance of fraudulent conveyances as a paradigmatic example of post-judgment enforcement power. Since Peacock v. Thomas, this court in Thomas v. Hughes also exercised ancillary jurisdiction in a Tukta suit against a party who the original judgment didn't decree any relief against them. They had done nothing wrong, but this court still approved ancillary jurisdiction in Thomas v. Hughes to protect against the possibility of future fraudulent conveyances. Five other circuits also agree. In fact, every circuit that has addressed this specific issue have all agreed that post-judgment enforcement power includes the power to set aside fraudulent conveyances. That's the Second Circuit in Epperson v. Entertainment Express, Third Circuit S.E.C. v. Antar, Ninth Circuit Thomas Head v. Buster, Tenth Circuit Atlas Biologicals, and Eleventh Circuit, I'm blanking on the name, but it's cited in our brief. The Eleventh Circuit, I believe, is National Maritime Services. We should be strong. Every circuit to address this issue has said that the avoidance of fraudulent conveyances is squarely a post-judgment enforcement mechanism available to courts. So how do you characterize other claims like alter ego and fraud? Your Honor, we recognize that, I mean, I would say 213 of our 213 paragraphs are tufted, which is Thomas v. Hughes held up. There are a handful of alter ego and bail-piercing claims, but as we made clear to the Disher court, we are seeking to seize the judgment debtor's property wherever it's been fraudulently conveyed. That is what our action is. And Judge Rosenthal recognized that the alter ego and bail-piercing claims would be entitled to differing treatment. I believe she says that at, let's see, the record from 1010 to 1013. So she's well aware of this. Your Honors, I have had- So they can arbitrate those while you litigate, or you can arbitrate tufta while they litigate fraud or vice versa? Well, the alter ego and bail-piercing claims, I think Your Honors, if you were writing an opinion, could sever, say the alter ego and bail-piercing claims are not within the jurisdiction. I think Judge Rosenthal was heading there anyway. She said she was going to write up an opinion. She said, give me some time to do so. I believe she says that at the record of 1010. But instead of waiting for her opinion, the Feldman party just filed an interlocutory appeal and then stopped all that from happening. But Judge Rosenthal is well aware of the third party limitations set forth by Peacock v. Thomas, said the alter ego and bail-piercing claims would be entitled to differing treatment. And we have represented that we are not pursuing those claims in court. And we represent that now here. I mean, we say on the record, we say if one of these other Feldman entities has $20 million in the bank account and the Feldman debtors fraudulently conveyed $10 million, we collect the $10, not the $20. I see what you're saying. So, and I'll point out, the only case that comes close to this situation that they've cited is the trans-first, the Magna De Arte case from the Northern District of Texas. You know, there, there was fraudulent conveyance claims and alter ego and bail-piercing claims. What the court did there is it instructed the plaintiff to amend its petition to cure its jurisdictional defects. So, and we're happy to do that as well. I mean, we are not pursuing the alter ego, bail-piercing claims. Our lawsuit is to seize the judgment debtors fraudulently conveyed properties wherever they may be located. And that has been a core and a paradigmatic example of ancillary jurisdictions as Peacock v. Thomas, this court in Thompson v. Hughes, and every other circuit court appeal to address that question. Well, you can, you can talk to me about the specifics of the arbitration clause in a minute, but hypothetically, were this to go to arbitration, could an arbitrator order them to turn a, it could, he could order them to turn over this property, right? And Your Honor, the issue with that, and this is, I believe, section four of our brief, they have no limiting principle. By the time we get an award and a judgment from a new arbitrator on this, even if we prevail. Well, I'm sorry, your client signed up for this agreement, so it's not, you know, it's as frustrating to the court as it is undoubtedly to your clients, but. There's never, what we are arguing, and there's no defense to it, and this gets into why article three power has always include this post-judgment enforcement power. Compelling post-judgment enforcement claims to arbitration is tantamount to rendering the felon and debtors permanently unaccountable for egregious misdeeds, stealing client funds held in trust. They can compel. Wait a minute, I think, wait, well, I guess preliminary, we'll come back to that. Let's go to the arbitration agreement, because it does seem to me that the definition of affiliates is extraordinarily broad. It is, your honor, but it's in the capstone services agreement. There's no definition of the engagement letter or the arbitration agreement itself. The engagement letter says it's signed by Stuart Feldman on behalf of the firm and capstone. Firm is defined as Feldman Law Firm and the lawyers. Capstone is defined as Capstone Associated Services and Capstone Associated Services Wyoming Limited Partnership. But it covers affiliates. It covers, so there's two clauses. There's the delegation clause, which is the parties agree, and the affiliates are most certainly not parties. And I'm happy to get into that argument in a second. If you look at the signature page of the capstone services agreement, if you look at the opening paragraph that says the parties entering into it, there was a purposeful decision by the drafters, the Feldman parties, to omit affiliates from the Feldman capstone side. The affiliates that were signing and entering into this agreement were the doctors, the doctors' companies and their affiliates on one side. On the other side, it's just capstone. No reference to affiliates. You can look at the signature page. And I point out too with Marla Matz, in the record at 964, she escaped arbitrating in the Judge Jones matter. Judge Jones finding that she was not a signatory and not found under the arbitration clause for that agreement. That was the engagement one. That's how they drafted it. And when you're talking about non-signatories, this gets into Jody James Farms, this court's case in Newman, and Sullivan 1. Your Honor may recall Jeff Carlson. The issue as to non-signatories and who is bound by an arbitration agreement is squarely a decision for the court to make, not an arbitrator. So their main argument is send this to the arbitrator and figure out whose party it is. Well, we didn't defer or delegate to arbitrator Jones as to whether Mr. Carlson was bound. Your Honor wrote, citing to Dean Howsam, that the parties bound by an arbitration agreement are, is a decision for the court to decide. That's what the Texas Supreme Court held in Jody James Farms. That's what this court held. Well, don't worry. We'll decide it. I appreciate that. But the arbitration agreement itself says relating to or arising under the services or the agreements. And if the court is deciding whether these non-signatory affiliates did nothing, there's no evidence that they performed any captive administrative service to the doctors. In fact, the fraudulent conveyances that are complained of occurred two to five years after Mr. Feldman terminated this agreement. This gets into just the absurd test results from the Revitch case from the Ninth Circuit. The delegation clause is only from the parties. The parties agreed to delegate arbitration ability. And if you look at the signature clause, the signature blocks of these agreements, the affiliates are only on the doctor's side. I understand that. But I mean, I'm looking at the engagement letters arbitration provision with respect to any and all other controversies, disputes, or claims whatsoever between the firm, including its lawyers and or its affiliates, including Capstone's, blah, blah, blah. It says who the affiliates, including. Yes, affiliates. Including Capstone Associates Services and Capstone Insurance Management. Well, yeah, and that gets down to whether including is exclusive or just descriptive. The sentence continues. Related to or arising out of the firm's or its affiliates' services or arising under or in connection with any of the parties' agreements. And what they are saying is fraudulent conveyances perpetrated five years after the contract is terminated somehow relate to the defined enumerated services on the engagement agreement. If you look at the record at, I believe it's 311 to 312, services are defined. It's an enumerated bullet point list. And at the end of that list, it says services beyond those enumerated above as standard services are not included in the services under this fee agreement. I don't understand how a fraudulent conveyance made five years after the contract terminated to avoid obligations under federal court judgment somehow relates to the limited services to be provided in this contract that was terminated years before. But I don't even think your honors need to grapple with the delegation clause and who's bound if you agree on our section one and two arguments, which is post-judgment enforcement includes the power to set aside fraudulent conveyances. That's grounded in Peacock v. Thomas. And the statutory ground, your honors, I think is dispositive here. And it distinguishes every single case that they have cited. Kubala, Henry Schein, all of those cases deal with pre-award, get compelling pre-award disputes into arbitration. Because the Federal Arbitration Act from sections one through four talks about how do we get these pre-award disputes into arbitration. But to say that the Federal Arbitration Act itself doesn't speak to this issue ignores section 13. Section 13, congressional intent, it talks about how to confirmed arbitration award. And it could not, the Congress could not have used broader language. It says a confirmed arbitration award. It says a judgment confirming an arbitration award shall be treated as any other judgment in all respects. It goes on to say, and may be enforced as if it had been issued by the court in that action. Section 13 mandates parody for judgments confirming arbitration awards. So it controls the party's agreement? Yeah, I think section, I think in... What's your best case for that? Since the court has said over, and I'm not, you know, I'm just asking. The court has said over and over and over and over, we look to the party's agreement. In the pre-award context, which is how we're supposed to interpret. What's your best case? I would say, I mean, there's a lot of aspects where things can't be delegated to the arbitrator, like soaring wind energy from this court. The coercive enforcement powers of a court cannot be delegated. No one could agree that the arbitrator could direct the sheriff to go seize properties or garnish wages. Enforcement has always been understood as a core Article III power, and it is a creature of necessity. That's what the Supreme Court said in Peacock. Well, this is where we get back to the question I asked you about how the arbitrator, whether the, how the arbitrator, what impact the arbitrator's decision on the Tufkin case would have. You'd go back to the district court, you'd get that award confirmed and a judgment entered. End of story. But it's not... Because then you have a final judgment and you call the sheriff out. Against these, this first group of LLCs, but like we just learned, by then the assets will have disappeared to a second group of LLCs. Well, and then we'll have to... Now, wait a minute. Now, wait a minute. What about prejudgment attachments? The property is already gone. They don't have the property. I'm telling you, in connection, if this is all hypothetical, of course, were the Tuft thing to be arbitrable, can an arbitrator issue a prejudgment attachment? I'm not sure that an arbitrator has that enforcement power. Well, if this were a collection, an ordinary collection case, you could go to the court under state law and say that you're entitled to a prejudgment attachment. And that's our whole point. Well, you didn't ask for that before Judge Rosenthal. Everything's been stayed in Judge Rosenthal's... No, you went, you filed a in her court as an ancillary thing. I'm not sure we'd be here. But the property was already gone. What would we be attaching? The property's already disappeared. That's the whole point. Well, if you say, if you say you're an enforcement, well, I mean, the case shouldn't turn, I think, on whether you put this as whatever your cause number was, a claim for Tufta against these new amenities within your original suit, or whether you filed it under a separate cause number. If I may just quickly, and then I want to conclude, the separate docket number, Your Honors, in this court's decision of Frank Minveil, in this court's decision of Royal Insurance Company America v. L. Quinn Corp., ancillary jurisdiction was exercised in a second separate docketed matter. In Atlas Biologicals, this argument was directly rejected. It was a second separated docket number. That's form over substance. I mean, there are a lot of cases cited in our brief where it's a second separate action. But to just briefly conclude, I see I'm running out of time. What the Feldman parties are attempting to do here is to weaponize an arbitration agreement to render themselves permanently unaccountable for egregious misdeeds, to render a federal judgment permanently unenforceable. Nothing prevents them from endlessly transferring their assets down a never-ending line of entities, and each one having the right to invoke arbitration and a mandatory stay of all enforcement proceedings while that goes on, in a loop that never ends. Your clients signed into it. I don't know what the outcome is, because again, you've created a morass. They signed an agreement that allows enforcement to go to a court, and that's exactly what the Federal Arbitration Act also mandates in Section 13. Well, if your clients hadn't been greedy and sought a class action and gotten $100 million, we wouldn't be here. We're arbitrating that, but if we end up getting- I know that. But I mean, that's where the problem starts, is all these arbitrators, which you did agree to, your clients did agree to, and of course, four people, just like on a court, four individuals come up with four different rulings. If we get any of the awards other than Glasser, Baker, Kutcher, or if we even get the sanction awards, if we get anything, there are no assets to collect because they have been fraudulently conveyed, and the only way to claw that back is with Article III power, and that power, as always, it's grounded in Article III of the Constitution. It is necessary. There is not a single case in any circuit that has said that a court does not have this power, and we've cited four cases that have specifically applied this ancillary jurisdiction power, specifically in the context of confirmed arbitration awards, and Section 13 mandates that the judgment confirming the award be treated like any other, and any other judgment would have this enforcement power, so to take their argument is to read Section 13 out of the Federal Arbitration Act. Well, I see I'm out of time, but I thank Your Honors for your time. All righty. Thank you, Your Honors. Let me go directly to your question, Judge Jones, about- I've got a question for that. I'm sorry, Your Honor. There's a, your, the engagement letter says that any person may have a U.S. district court or another court of competent jurisdiction enter the findings of the arbitrator for all purposes, including the confirmation and enforcement of any award. Yes, Your Honor, but we think that this is not an enforcement action because of all the causes of action they've brought against us, and because it's a new cause of action against 25 new defendants seeking all kinds of new judgments. Ancillary enforcement power, in our view, and we point to the Peacock case, is, does not include a fraudulent transfer case in that context. Peacock disapproved exactly such a claim. My friend on the other side says he's citing Peacock. Peacock has citations that say things like garnishment in the same action are ancillary enforcement action, and then it says this case, the case he's talking about, is not, and so if they accept that analogy to the ancillary enforcement jurisdiction of the district courts, they're wrong about that, in our view, even if it wasn't delegated to the arbitrator. Can the court order your client to unwind? Can the court order it? The court certainly has such powers, but what I would say, Your Honor, is the arbitrator also has such powers. But your agreement says to enforce any award, and could Judge Rosenthal order your client to unwind all of those transfers? The court has such power, but we also have the power to arbitrate that dispute. That is what the arbitration agreement says. If your agreement says, I'm just asking, is between the signatory parties, Judge Rosenthal could order an unwinding? I have not thought about unwinding as a cause of action, Your Honor, or, you know, whatever it is, but the way we read the arbitration agreement, if we move to compel arbitration, she is required to compel arbitration over that dispute. Not if it's an enforcement action to unwind. No, no. We think even if it's an enforcement action, it is not exclusive to the district court. Both entities have authority over enforcement actions, both the arbitrator and the district court. Now, we think this isn't even an enforcement action, but even if you disagree with us on that, both entities have authority, and that is a question that is delegated to the arbitrator. That's not what your engagement letter says. Yes, it is, Your Honor. It says the enforcement of any ward, the district court shall. The district court shall, but it does not say that there is an exception to arbitrability for enforcement actions. If you look at the delegation clause, which is the sentences, few sentences up, the parties agree that the issue of arbitrability shall likewise be decided by the arbitrator, not by any other person. The question of whether a and not by a court. They can go to the arbitrator and argue that this is an enforcement action that is exclusively to the district court, and we will argue with them there, but that is the way this arbitration agreement sets up that dispute in our view. Now, as to your question, Judge Jones, the arbitrator has injunctive power. If they're complaining about us supposedly sending assets here and there, they can seek injunction from the arbitrator, and indeed, they should have done that rather than trying to go in district court and causing a stay of the litigation for a year if they're really concerned that all the assets are going away, but of course, they're not doing that. We paid $1.5 million. We paid a substantial sum as part of the Bill Boyce arbitration. I understand it's not the sum they want, but given that their actual damages in this case are in the this is the first time I'm hearing of it. It's not in the appellate record. They've never made the argument that they were audited because of this. They've never paid a single tax penalty that we're aware of because of the alleged misconduct. Well, there is the problem that they sold this insurance thing, and then your clients were using it to pay their own legal expenses, so that is that. That's why we've paid the Glasser judgment, and that's why we are in front of Justice Boyce to figure out how much we need to pay. We're not saying Mr. Feldman doesn't pay anything. Indeed, we've paid. The question is, does he need to pay the $100 million Judge Jones award under the Glasser arbitration, or what other award does he need to pay? The other thing I want to say before my time runs out is that my opponent said that at least some of this is arbitrary. That's what I heard him say today. All their non-Tufta claims are apparently arbitrary. Well, actually, what he said is they're not pursuing those. Well, they've never said that to the court. As far as we know, they're pursuing them. That's what we sought a motion to compel arbitration of. Well, did Judge Rosenthal say, give me some more time, I'll get to that? Did she say that or not? No, Your Honor. She said, I'm going to write an opinion, but then she issued an order. That's an ROA 11. It's a minute order, but it says, I deny the motion to compel arbitration. We couldn't stand on our rights at that point. That's a judgment, and we have to appeal. This notion that we should have waited. I'm just saying, did she say that or not? She said that during the hearing, that I'm going to write this up, but then she didn't, and she issued the order. We took an appeal. I will comment that if what they say is accurate, of course, from a judgment creditor is a crime. In Texas, it's almost surely a crime. In Louisiana, and it probably involves interstate action as well. I'm sure you're aware of that on behalf of your clients. The final thing I would ask is, what do you say about all these cases that they cite that said that the court had ancillary jurisdiction? A couple things about that. First of all, they are not Fifth Circuit cases. The case that controls here, there are two cases. One is Berry. That's your case. That says, a new cause of action is not in the ancillary enforcement power. The second case is Peacock. That's the Supreme Court. Supreme Court says, this kind of case is not in the ancillary enforcement power. The cases they cite are factually different. This is set forth in our brief. They are not this kind of case bringing new causes of action against all kinds of new people. All right. Thank you. Thank you.